UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------x

UNITED STATES OF AMERICA    :

   :

   :     19-cr-96 (JSR)

     -v-    :

   :     MEMORANDUM ORDER

SYDNEY SCALES,    :

   :

    Defendant.    :

   :

------------------------------------x

JED S. RAKOFF, U.S.D.J.

From approximately 2016 to 2019, Sydney Scales operated a conspiracy that distributed crack cocaine and other drugs in the West Farms neighborhood of the Bronx. Scales provided other co-conspirators with weapons and maintained his territory and business through acts of violence, including plotting to murder rival drug dealers. Following a trial conducted from July 20 to August 5, 2021, a jury found Sydney Scales guilty of conspiracy to distribute or possess with intent to distribute powder cocaine, heroin, fentanyl, marijuana, and 280 grams or more of crack cocaine, in violation of 21 U.S.C. §§ 841(b)(1)(A) and 846; conspiracy to commit murder for hire, in violation of 18 U.S.C. § 1958; possessing, brandishing, and discharging firearms in furtherance of the narcotics conspiracy, in violation of 18 U.S.C. §§ 924(c)(i), (ii), and (iii); and two counts of distribution of

crack cocaine, in violation of 21 U.S.C. § 841(b)(1)(C).[1] See ECF No. 207.

Now before the Court are Scales's motions under Federal Rules of Criminal Procedure 29 and 33, for judgment of acquittal or, in the alternative, for a new trial. ECF No. 249. By bottom-line order dated February 14, 2022, the Court denied those motions. This Memorandum Order sets forth the reasons for that ruling.

## LEGAL STANDARDS

Federal Rule of Criminal Procedure 29 requires a district court, upon the defendant's motion, to "set aside the verdict and enter an acquittal" of any offense "for which the evidence is insufficient to sustain a conviction." A defendant challenging the sufficiency of the evidence underlying a conviction bears "a very heavy burden." United States v. Ragosta, 970 F.2d 1085, 1089 (2d Cir. 1992). In evaluating such a motion, the Court must "review all of the evidence presented at trial in the light most favorable to the government, crediting every inference that the jury might have drawn in favor of the government." United States v. Walker, 191 F.3d 326, 333 (2d Cir. 1999) (internal quotation marks

---

[1]    These are Counts One, Two, Five, Seven, and Eight in the indictment. The jury found Scales not guilty on Counts Three (murder while engaged in a drug conspiracy) and Four (murder using a firearm). Counts Three and Four were related to the murder of Joshua Lopez; Count Five concerned a separate conspiracy to murder rival drug dealers. Count Six was not part of the case at trial.

omitted). The Court affirms a conviction as long as "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original).

Federal Rule of Criminal Procedure 33(a) allows a district court to "vacate any judgment and grant a new trial if the interest of justice so requires." The defendant bears the burden of proving his entitlement to a new trial under Rule 33. See United States v. McCourty, 562 F.3d 458, 475 (2d Cir. 2009). The court has "broad[] discretion" to grant a new trial, but should exercise such authority "sparingly and in the most extraordinary circumstances." United States v. Ferguson, 246 F.3d 129, 134 (2d Cir. 2001) (internal quotation marks and citation omitted). The ultimate inquiry is "whether letting a guilty verdict stand would be a manifest injustice." United States v. Aguilar, 737 F.3d 251, 264 (2d Cir. 2013) (internal quotation marks and citation omitted).

## ANALYSIS

Scales moves for judgment of acquittal under Rule 29 as to the murder-for-hire conspiracy (Count Two) on the ground that there was insufficient evidence that Scales offered to pay something of pecuniary value in exchange for the murder. Alternatively, Scales moves for a new trial under Rule 33 as to both the murder-for-hire conspiracy and a § 924(c) firearms offense (respectively, Counts

Two and Five) on the ground that multiple guns were admitted without a sufficient nexus to the charged drug conspiracy or evidence that the guns were used "in furtherance" of a drug trafficking offense; or a new trial on the ground that arguments in the Government's rebuttal summation constituted prosecutorial misconduct by assuming facts not in evidence and improperly shifting the Government's burden of proof. ECF No. 249. The Court addresses each motion in turn.

## I. Rule 29

Scales first moves under Rule 29 to vacate his murder-for-hire conviction on the ground that there was insufficient evidence that Scales offered Luis Simone or Jose Santiago something of "pecuniary value" as required by 18 U.S.C. § 1958. Scales argues that Luis Simone's testimony that he assumed he would be paid does not constitute a bargained-for exchange, and that the only other evidence of pecuniary value was testimony from Jose Santiago that was contradicted by Simone's testimony and was otherwise uncorroborated and incredible on its face.

The murder-for-hire conspiracy (Count Two) concerned Scales enlisting Jose Santiago to kill some of the Lambert House rival drug dealers.[2] Santiago testified that shortly after he was

---

[2]   This was distinct from the murder of Joshua Lopez at issue in Counts Three and Four.

released from jail in January 2017, he met with Scales to discuss, among other topics, murdering two people from Lambert in exchange for Scales forgiving a drug debt owed by Santiago's brother, Hood, and Scales paying Santiago $20,000. Tr. 519:2-3, 524:5-23, 526:12-24. More specifically, Santiago testified that Scales told him that Santiago would receive $20,000 if he murdered Dondre Myers, that Breeze Balla would be "a little bit less," and that other gang members would be "at least five thousand." Tr. 526:14-17. Santiago also testified that Scales told him that in exchange for Santiago carrying out the murders, Santiago and his brother would control drug sales on the block and that an unspecified amount of debt that Hood owed would be cleared. Tr. 526:20-24.

When Scales needed someone to drive Santiago for these murders, he talked to Luis Simone. Tr. 212:2-7, 213:2-10. Luis Simone testified that Scales did not explicitly offer him payment, but that Simone "just assumed" that he would be "paid something." Tr. 264:10-12. Simone testified that he expected Scales to "hit [them] off," i.e., that Scales would pay Simone and Santiago. Tr. 148:14-24. Simone agreed to participate because he "[n]eeded the money." Tr. 148:14-24, 213:18. Jorge Marin, who also drove Santiago around purportedly to look for targets, similarly testified that Santiago would "be compensated" by Scales for the murder. Tr. 1343:2-7; see also Tr. 1327:14-1328:6.

Scales first argues that Simone's testimony that Scales would "hit [them] off" is legally insufficient to establish the pecuniary value element because it is too vague about the amount of future payment and would not amount to consideration in an ordinary bargained-for exchange. See United States v. Frampton, 382 F.3d 213, 219 (2d Cir. 2004) (discussing that "the mere fact that the consideration offered by one (the solicitor) in exchange for another's (the murderer's) agreement to commit a murder *could* inure to the economic benefit of the latter is insufficient" (emphasis in original)); see also United States v. Hardwick, 523 F.3d 94, 99-100 (2d Cir. 2008) ("The consideration requirement of Section 1958 is interpreted in 'the traditional sense of bargained for exchange . . . .'" (internal citation omitted)).

However, while Frampton held that an offer to perform an unspecified future "favor" was insufficient to establish the pecuniary value element, the Second Circuit has since distinguished that holding in United States v. Babilonia, finding that the solicitor's promise to "hold [the hired killer] down" and that the killer would "be good" was sufficient for a jury to infer a promise of financial compensation, as was consistent with the killer's interpretation. 854 F.3d 163, 175-76 (2d Cir. 2017) ("Unlike in *Frampton*, where there was no indication that either party believed that money would be exchanged, Wilson testified that he understood Davis's representation that he would 'hold

6

[Wilson] down' to mean, among other things, that Matt and Key's other associates would take care of Wilson financially."). Here, Simone testified that Scales offered to "hit [him and Santiago] off" and that he understood this to mean he would be paid money, Tr. 148:14-24; Marin also testified that Santiago stated he would "be compensated" by Scales for the murder, Tr. 1343:2-7. Simone's testimony that Scales would "hit [him and Santiago] off" for committing the murder is sufficient to establish the pecuniary value element because a jury could infer a promise of financial compensation, as in Babilonia, consistent with Simone's interpretation. This also serves to corroborate Santiago's testimony that Scales offered to compensate him in exchange for committing the murder.

Second, Scales argues that Simone's testimony specifically contradicted Santiago's testimony about what Scales offered Santiago. The defense argues that Santiago did not testify clearly or consistently about whether Simone was present for his conversation with Scales, Tr. 836:17-837:1, and that Simone, in contrast, was unequivocal that he and Santiago were both present for the conversation and that Simone did not hear Scales refer to cash or $20,000. Tr. 263:21-23. There was not, however, evidence that Simone was present when Scales made the offer to Santiago. Tr. 308:8-18 (Simone denying that he introduced Scales and Santiago "close in time" to, or "[w]ithin days" of, agreeing to drive

Santiago), 836:18-837:1 (Santiago saying he did not believe Simone was present for the discussion of payment). Simone recalled that his first conversation about the murder-for-hire plot was when Scales said he needed someone to drive Santiago, suggesting that Santiago had already agreed to do it and that the conversation thus happened later. Tr. 212:2-7. Viewing the facts in the light most favorable to the Government and crediting the inferences the jury could have drawn in the Government's favor, Simone's testimony does not clearly contradict Santiago's testimony about what Scales offered Santiago.

Third, Scales argues that Santiago's testimony that Scales promised to clear Hood's drug debt in exchange for Santiago committing the murder was facially implausible and inherently inconsistent, arguing that another witness, Jorge Marin, was unaware of such a debt, see Tr. 1316:21-1317:1, and that while Santiago testified that he learned about Hood's debt from Hood, Tr. 835:10-14, he never told his brother about his plans to do the murder in part to get the debt forgiven. Tr. 850:13-18. Viewing the facts in the light most favorable to the Government and crediting the inferences the jury could have drawn in the Government's favor, a jury could find that Santiago tried to clear his brother's drug debt while also keeping his brother from knowing about -- and thus being culpable for -- the murder-for-hire plot.

Fourth, Scales makes broader arguments that Santiago's testimony was generally implausible and inconsistent, and therefore that no jury could have credited his specific testimony that Scales offered to pay him in exchange for committing the murder. The jury, however, heard all of the defense's arguments attacking Santiago's credibility, both through cross-examination and in closing argument (which focused on undermining Santiago's credibility). See Tr. 718:9-903:2, 918:2-937:5, 1007:20-1026:3, 1963:15-2017:7. Because the jury was thus well-informed about these arguments about Santiago's lack of credibility, it would be improper for the Court to now substitute its own credibility assessment for that of the jury. See, e.g., United States v. Baker, 899 F.3d 123, 130 (2d Cir. 2018) ("We will not attempt to second-guess a jury's credibility determination on a sufficiency challenge, particularly when, as is the case here, trial counsel already presented these same credibility arguments to the jury." (internal quotations marks and citation omitted)); United States v. Florez, 447 F.3d 145, 156 (2d Cir. 2006) ("To the extent Florez challenges the accomplices' credibility based on their plea agreements with the government and their long histories of criminal and dishonest behavior, he simply repeats facts and arguments already presented to the jury.").

In sum, Simone's testimony that Scales would "hit [him and Santiago] off" for committing the murder was sufficient as a matter

of law to establish the pecuniary value element because a jury could infer a promise of financial compensation consistent with Simone's interpretation. Furthermore, Santiago's testimony was neither uncorroborated nor incredible on its face. Viewing the facts in the light most favorable to the Government and crediting the inferences the jury could have drawn in the Government's favor, Scales's attacks on the credibility of Santiago's testimony, both in general and specifically about the murder-for-hire exchange, utterly fail. And again, Scales's arguments about Santiago's lack of credibility in general were presented to the jury, which apparently found Santiago nonetheless credible; accordingly, these arguments do not outweigh the specific plausible testimony of Simone and Santiago that Scales promised to compensate them in exchange for committing the murder. The Court accordingly denies Scales's motion under Rule 29 for a judgment of acquittal on the murder-for-hire conspiracy count.

## I. Rule 33

Scales moves, alternatively, under Rule 33 for a new trial on two grounds: (A) that evidence relating to at least five guns or other acts of violence was admitted without a sufficient nexus to the charged conspiracy, rendering the evidence impermissible, and highly prejudicial, propensity evidence, and (B) that statements

made by the Government in its rebuttal summation were unsupported by the factual record and constituted prosecutorial misconduct.

A. Evidence of Firearms and Charged Conspiracy

Scales argues that he is entitled to a new trial on the murder-for-hire conspiracy count (Count Two) and § 924(c) firearms count (Count Five) on the ground that evidence of at least five firearms was admitted in error; Scales argues that they lacked any connection to the charged narcotics conspiracy and were thus not direct evidence of Count Five or Count One, and that they thus operated as impermissible propensity evidence causing undue prejudice to Scales.

As detailed below, Scales's argument falters on two fronts. First, Scales's possession of a gun -- a tool of the drug trade -- is direct evidence of his participation in a narcotics conspiracy; the jury was entitled to consider all of the evidence at trial, from which it could reasonably infer that Scales possessed his guns in furtherance of the charged conspiracy. Second, even considering the evidence of firearms separately, there was sufficient evidence that each instance of gun possession about which the witnesses testified had a direct connection to Scales's drug business.

1. Evidence of Firearms and Other Acts of Violence

Use of a firearm is "in furtherance of" a drug trafficking crime within the meaning of § 924(c) if there was "some nexus

between the firearm and the drug selling operation." United States v. Finley, 245 F.3d 199, 203 (2d Cir. 2001). "'[I]n furtherance' means that the gun afforded some advantage (actual or potential, real or contingent) relevant to the vicissitudes of drug trafficking." United States v. Lewter, 402 F.3d 319, 322 (2d Cir. 2005).

Scales argues that the firearms evidence was not direct evidence of the charged drug conspiracy or firearms offense and that the Court should have conducted a Rule 404(b) analysis of such evidence as uncharged criminal activity. See United States v. Snow, 462 F.3d 55, 62 (2d Cir. 2006) (noting that it is insufficient for purposes of establishing a nexus for § 924(c) to "rely[] on the generalization that 'any time a drug dealer possesses a gun, that possession is in furtherance, because drug dealers generally use guns to protect themselves and their drugs.'" (internal citation omitted)).

Evidence of Scales's possession of firearms was, in fact, direct evidence of his participation in the narcotics conspiracy, and admissible as such. Any act alleged to have been done in furtherance of an alleged conspiracy is considered to be part of the charged conspiracy, see, e.g., United States v. Diaz, 176 F.3d 52, 79 (2d Cir. 1999); where a conspiracy is charged, uncharged acts may thus be admissible as direct evidence of the conspiracy itself, see, e.g., United States v. Miller, 116 F.3d 641, 682 (2d

Cir. 1997). Even if an act is not overtly done in furtherance of a conspiracy, "evidence of uncharged criminal activity is not considered other crimes evidence under [Rule] 404(b) if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000) (internal quotation marks and citation omitted).

Acts of violence in furtherance of the narcotics conspiracy were thus admissible as direct proof of the existence of the conspiracy and of Scales's participation in the conspiracy. See, e.g., United States v. Santos, 541 F.3d 63, 72 (2d Cir. 2008) (noting that disputes in narcotics conspiracies "are frequently settled by force or the threat of force" and that "advancing the aim of a narcotics conspiracy can involve . . . enforcing discipline and chastising rivals" (internal quotation marks and citations omitted). More specifically, the evidence of firearms was admissible "as proof of [a] narcotics conspirac[y] because drug dealers commonly keep firearms on their premises as tools of the trade." United States v. Mitchell, 328 F.3d 77, 82 (2d Cir. 2003) (internal quotation marks and citation omitted); see also United States v. Page, 657 F.3d 126, 130 (2d Cir. 2011) (explaining that "to prove [the defendant]'s knowing possession of the gun,

the government would have been entitled to offer evidence of his narcotics trafficking" and "to prove the existence of a conspiracy to distribute narcotics, the government would have been entitled to offer proof of [the defendant']s possession of a tool of the trade," such as a firearm (internal quotation marks and citations omitted)). Scales's possession of a gun -- a tool of the drug trade -- is direct evidence of his participation in a narcotics conspiracy; the jury was entitled to consider all of the evidence at trial, from which it could reasonably infer that Scales possessed his guns in furtherance of the charged conspiracy.

Scales also challenges specific instances of gun possession about which several witnesses testified: Tiquana Stevenson's testimony about the December 1, 2016 shooting that targeted Lambert Houses dealers; Jorge Marin's testimony about a gun that Scales directed him to retrieve and give to another person, who in turn discussed the location of rivals from Lambert; and Albert Collins's and James Crooms's testimony about Scales's gun possession during drug transactions and to collect a debt. As discussed further below, a jury could reasonably conclude that Scales's gun possession in each of these instances was in furtherance of the charged conspiracy.

Scales first challenges Stevenson's testimony about the December 1, 2016 shooting targeting Lambert Houses dealers. Tiquana Stevenson testified that in late 2016, Scales asked her to

pick up two men near Hoe Avenue. Tr. 356:14-24. After parking at the corner of 179th and Boston Road with Scales and the two men, she heard the metallic sound of a gun in the backseat and the two unknown men got out of the car and walked toward Boston Road. Tr. 357:24-59:11. Two to three minutes later she heard gunshots. Tr. 359:12-18. The two men returned to the car, and they all left the area. Tr. 360:3-7. Other evidence showed that on December 1, 2016, at 7:51 p.m., someone shot towards the front of the West Farms convenience store on the corner of Boston Road and East Tremont Avenue, one block from where Stevenson said they parked. See GX 610A, 611. One of the individuals present in front of the convenience store was Dondre Myers. Tr. 1930:22-1931:9. Cell site location evidence from Scales's phone also corroborated Stevenson's description of their movements. See GX 423, 424.

There was ample evidence corroborating Tiquana Stevenson's testimony. Video of the shooting confirms that the shooting occurred at the location where Stevenson said she heard gunshots after the two men got out of her car and that the shooter came from the direction of her car. See GX 610, Tr. 357:24-360:1. The shooting location was on the Lambert dealers' territory where they frequently sold drugs. See Tr. 441:9-22, 1113:18-24. Santiago testified that Scales would pay "at least five thousand" if Santiago shot "anybody that was part of that [Lambert] team." See Tr. 526:12-17. Toll and cell-site location records showed Scales's

communications with Stevenson on December 1, 2016 and his proximity to the location where Stevenson parked her car before the shooting and to multiple locations along the route she drove afterwards. See GX 423, 424. And a handheld scanner capable of monitoring police frequencies was seized from the location Scales used to package drugs, see GX 911, 305Z, consistent with Stevenson's testimony that Scales was listening to a police radio immediately after the shooting, see Tr. 360:19-361:1. Viewing the evidence in its entirety, a jury could reasonably conclude that the shooting about which Stevenson testified was related to Scales's conspiracy to distribute drugs throughout the West Farms neighborhood.

Scales next challenges Marin's testimony about a gun that Scales directed him to retrieve and give to another person, who discussed the location of rivals from Lambert. Jorge Marin testified that at some point in 2016, Scales told him to pick up a gun from someone named "Macho" and to "just hold it." Tr. 1247:10-1248:10. After he picked it up, Marin saw the gun was loaded. Tr. 1249:6-22. Scales told Marin that another person, Unc, would come to retrieve it. Tr. 1249:23-1250:4. Marin testified that when Unc picked up the gun, Unc said that "he had got a phone call and they told him that they in the play yard Lambert." Tr. 1250:13-15. When Unc returned the gun to Marin, it only had three bullets left in the chamber. Tr. 1251:16-19.

A jury could reasonably conclude from Marin's testimony that the firearm was possessed or used in furtherance of the drug conspiracy: Scales directed Marin to retrieve a gun and give it to another person, who, while taking the gun from Marin, told Marin about the location of Scales's drug rivals from Lambert, and who then returned the gun with bullets missing. This is particularly reasonable in the context of testimony from three other witnesses about Scales's regular possession of guns in connection with his drug business, his conflict with dealers from Lambert, and his practice of causing other co-conspirators to carry and use guns to further their drug business. See, e.g., Tr. 542:1-545:4, 581:3-11, 662:8-23, 1625:21-1626:8, 1411:7-1418:14.

Finally, Scales challenges Crooms's and Collins's testimony about Scales's gun possession during drug transactions and to collect a debt. Albert Crooms and James Collins, individuals in the Lambert Houses to whom Scales sold drugs in 2015 and 2016, testified about multiple guns. Specifically, Crooms testified that at some point in 2015, when Crooms was picking up crack on consignment, Scales offered to sell him a gun. Tr. 412:3-414:14. Crooms also testified that he accompanied Scales to collect a debt and observed Scales provide a firearm to another person from Lambert. Tr. 414:15-418:20. Collins testified that he once observed Scales possess a gun in the hallway at Lambert when Scales was picking up drugs. Tr. 1105:20-1107:1. When Scales showed

Collins the gun, Scales said it was his "new toy." Tr. 1106:18-19. A jury could reasonably conclude that the firearms about which Crooms and Collins testified were possessed or used in furtherance of the drug conspiracy when it was, in both cases, *during a drug transaction* that Scales asked Crooms if he wanted to buy a gun and that Scales showed Collins the gun Scales had brought with him.

Individual witness testimony about instances of gun possession need not constitute self-contained proof of a § 924(c) violation; the jury was entitled to consider all of the evidence at trial in determining whether Scales was guilty of the "general act of using firearms in relation to the underlying drug offense." United States v. Lindsay, 985 F.2d 666, 675 (2d Cir. 1993). Multiple cooperating witnesses testified about the role of guns in Scales's conspiracy: that they were used for protection, to collect debts, and to engage in violence against rival dealers. See, e.g., Tr. 542:1-545:4, 581:3-11, 662:8-23, 1625:21-1626:8, 1411:7-1418:14. Considering all the evidence at trial, a jury could reasonably infer that Scales possessed his guns in furtherance of a charged conspiracy.[3]

---

[3]    Because the firearms evidence discussed above was properly admitted, the Court need not address Scales's arguments that he suffered prejudice.

2. Multiple Conspiracies Instruction

In addition, Scales argues that the guns about which Crooms and Collins testified did not have a connection to the *charged* drug conspiracy in Count 1, even if they were in furtherance of drug trafficking generally.[4] Scales requested a multiple conspiracies charge, arguing specifically that there was no evidence that the Lambert drug sales were connected at all to the subsequent drug dealing that was the focus of the Government's case. Tr. 1731:17-1733:24. The denial of a multiple conspiracies instruction is error only if "there was evidence of separate networks operating independently of each other" and the defendant "suffered substantial prejudice resulting from the failure to give the requested charge." United States v. Korman, 75 F. App'x 42, 43 (2d Cir. 2003) (summary order) (internal quotation marks omitted) (quoting United States v. Cusimano, 123 F.3d 83, 89 (2d Cir. 1997)). The Court finds that Scales has not satisfied either element here.

Scales argues that there were separate networks operating independently of each other, asserting that there was no connection between Scales's Lambert drug sales in 2015 and 2016 and his

---

[4]    In pre-trial motions, Scales moved unsuccessfully to dismiss Count One as impermissibly duplicitous, arguing that the drug conspiracy encompassed more than one conspiracy. See ECF No. 142 at 48-49. Scales also raised the issue *in limine* and in the context of the admission of certain evidence. Tr. 158:2-159:2, 1480:22-1481:2.

subsequent operation at 181st and Mohegan. Scales argues that they are not connected temporally (asserting that the charged conspiracy spanned from 2016 to 2019, while the drug sales in Lambert were in 2015) and did not involve the same individuals (asserting that any agreement between Crooms, Collins, and Scales ended in 2016, when the Scales-Lambert rivalry began, see Tr. 1239:4-1243:9, 454:17-457:6, 462:1-17, 1153:2-1154:25). Scales further argues that there was no "rim" connecting the Crooms and Collins "spoke" with the members of the charged conspiracy, where neither Crooms nor Collins mentioned contact with the individuals in the charged conspiracy selling on Mohegan or packaging at 780 Garden Street. See Tr. 491:16-492:5, 1155:10-1156:11; Kotteakos v. United States, 328 U.S. 750, 754-55, 768-69, 773-74 (1946) (holding that separate spokes that meet at a common hub, the common defendant, constitute a conspiracy only if those spokes are enclosed by a rim, requiring a shared, single criminal objective and not satisfied by proof of similar or parallel objectives between similarly situated people). Scales argues that evidence of guns before the start of the charged conspiracy in 2016, which includes all of the guns associated with Crooms and Collins, thus does not constitute evidence of either the charged narcotics conspiracy or the related § 924(c) charge.

Scales's argument based on Kotteakos that these were separate conspiracies because the various street-level dealers were not

mutually dependent on each other thus is premised on his characterization of the circumstances as showing that some co-conspirators sold in different parts of West Farms and did not interact with each other, and that co-conspirators from Lambert operating in 2015 were at cross-purposes with those in other locations operating after 2016 because of Scales's rivalry with the Lambert dealers starting in 2016. But the evidence at trial showed that Scales's various street-level dealers both sold drugs in particular locations and carried out other tasks for Scales that furthered the conspiracy across the West Farms neighborhood, contradicting the defense's characterization that the dealers operated in discrete geographic spheres and were therefore not mutually dependent. As part of the drug conspiracy to distribute crack cocaine and other drugs in the West Farms neighborhood, Scales employed street-level drug dealers at various times to sell his product in specific places *and* to do other things that would advance Scales's distribution of drugs *across all his territories* in the West Farms neighborhood; each co-conspirator's role was not limited simply to selling drugs in a specific and discrete geographic area.[5]

---

[5]    The co-conspirators were also involved in activities other than selling drugs in specific areas, activities for Scales that furthered the broader object of the conspiracy and Scales's interests. Tr. 414:15-418:20 (Crooms accompanied Scales and other co-conspirators to Hunts Point to collect a debt); 1581:19-1583:12, 1586:2-19 (Yogi and White Boy robbed Raymond Santiago in

Nor does Scales's attempt to draw a temporal distinction between separate conspiracies, marked by the start of Scales's rivalry with some Lambert dealers in 2016, undermine the ongoing existence of a single conspiracy with the object of distributing crack cocaine and other drugs in the West Farms neighborhood, continuing from approximately 2015 to 2019.[6] The fact that some Lambert dealers broke off from this conspiracy in 2016 is of no moment given the evidence that Scales continued the same overall conspiracy to accomplish the same objective in the same neighborhood with several of the same co-conspirators. See United States v. Pena, 846 F. App'x 49, 51–52 (2d Cir. 2021) (summary order), cert denied, 141 S. Ct. 2872 (2021) (holding that changes

---

late 2016 or early 2017 after Scales warned Santiago that his drug sales a block away were interfering with Scales's drug business at 800); Tr. 545:9–546:23, 563:6–565:8, 578:6–580:1 (Jose Santiago managed sales on Mohegan and also delivered drug product to White Boy at 800, and was told by Scales that if he needed guns or support defending Mohegan, he could call Yogi and White Boy); Tr. 145:22–148:16, 528:18–24, 582:3–585:3, 590:18–19, 1258:2–1259:17; GX 426, 503, 503A–B (Yogi and White Boy from 800 helped initiate the murder-for-hire conspiracy targeting the Lambert dealers who had stopped working with Scales, a murder that Scales directed Jose Santiago, Simone, and Marin, all from Mohegan, to carry out); Tr. 1406:1–1418:23, 1501:11–1511:16 (Scales employed Summers, from Southern Boulevard, to make deliveries and pick up money from Mohegan).

[6]   The dates alleged in an indictment need not be proven with specificity as long as there is a "substantial similarity" between the dates charged and proven. See, e.g., United States v. Kaid, 241 F. App'x 747, 751–52 (2d Cir. 2007) (summary order).

in membership and principal locale of conspiracy operations did not convert one conspiracy into two).

In any event, even assuming _arguendo_ that Crooms and Collins could somehow be viewed as part of a separate conspiracy and a multiple conspiracies instruction were warranted, Scales did not suffer substantial prejudice from Crooms's and Collins's testimony about guns. As discussed above, such evidence would have been admissible as direct evidence of the drug conspiracy charged in Count One and of the first element of the § 924(c) count; Scales was tried alone and not alleged to be culpable for the crimes committed by Collins, Crooms, or other Lambert dealers; and Crooms's and Collins's testimony was not otherwise shocking or inflammatory. A multiple conspiracies instruction is chiefly intended to mitigate the risks of spill-over prejudice from evidence admitted against improperly joined co-defendants or others who were not part of the defendant's conspiracy -- risks not present in Scales's single-defendant trial. See United States v. Dove, 884 F.3d 138, 149 (2d Cir. 2018).

B. Government Rebuttal Summation

Scales also moves under Rule 33 for a new trial on the ground that statements made by the Government in its rebuttal summation were unsupported by the factual record and constituted prosecutorial misconduct. Scales argues that the Government's rebuttal summation deprived Scales of a fair trial in stating that

"[w]hen the defendant gave Rysheen Summers the gun to shoot Raymond Santiago, he didn't know Santiago had been arrested. Nobody knew that." Tr. 2039:14-16. A new trial is warranted where the prosecutor's improper statements, "viewed against the entire argument before the jury, deprived the defendant of a fair trial." United States v. Forloma, 94 F.3d 91, 94 (2d Cir. 1996) (internal quotation marks and citations omitted). In considering whether the defendant was deprived of a fair trial, a court considers "(1) the severity of any misconduct, (2) the measures taken to cure the misstatements, and (3) their likely effect on the outcome." Id. at 95.

During trial, Summers had testified that Scales offered to pay him to shoot Raymond Santiago because of the debt Santiago owed Scales. The defense argued that this was damaging to Scales because it operated as propensity evidence with regard to the murder-for-hire conspiracy. In closing, the defense argued that Summers was lying when he testified, because, inter alia, the time the alleged murder-for-hire took place was 11 months after Raymond Santiago's debt originated and while Santiago was incarcerated. Tr. 2012:6-10 ("[Y]ou heard from Agent Auman that [Raymond Santiago] has been locked up and detained as of October 29, 2018. So, according to Rysheen, Sydney Scales is hiring him to shoot somebody who's already locked up in federal jail. It makes no sense because none of it is true."). In its rebuttal summation, the

Government stated that "[w]hen the defendant gave Rysheen Summers the gun to shoot Raymond Santiago, he didn't know Santiago had been arrested. Nobody knew that." Tr. 2039:14-16.

The defense argues that there was no evidence that Scales did not know that Raymond Santiago had been arrested, that "nobody knew," or that the arrest was secret -- and that the Government's statement thus improperly implied that there was no evidence that Scales knew about Santiago's arrest, shifting the burden of proof to the defense. The defense argues that it prejudiced Scales because it undermined defense counsel's argument and bolstered Summers's credibility without any curative instruction. The effect, so the defense argument goes, was to predispose the jury to conclude that because Scales had engaged in a separate murder-for-hire conspiracy with Summers, Scales also committed the charged murder-for-hire conspiracy with Jose Santiago.

But this argument ignores the evidence and the reasonable inferences to be drawn therefrom. There was evidence in the record that Scales developed a motive to kill Raymond Santiago in July 2018, after Scales gave Santiago a firearm to collect on a drug debt, but that Santiago instead fled to Pennsylvania. Tr. 1622:10-1623:10, 1629:5-21. Santiago later returned to New York, but lived primarily in Harlem, not the Bronx. Tr. 1634:3-19. The jury was free to infer from this that Scales was not aware of Santiago's daily whereabouts, let alone his arrest, and the jury was thus

free to credit Summers's testimony that Scales hired him to kill Santiago in the fall of 2018 and gave him a firearm in December 2018 for that purpose. Tr. 1410:19-1419:9. Law enforcement officers seized that firearm and over a hundred bags of Scales's crack from Summers's home approximately a week later. Tr. 1422:3-1425:22. The jury could reasonably conclude from Scales's provision of a gun to Summers that Scales was not aware of Santiago's arrest.

On the one hand, "it is improper for a prosecutor to mischaracterize the evidence or refer in summation to facts not in evidence." United States v. Rosa, 17 F.3d 1531, 1548-49 (2d Cir. 1994). On the other hand, because defense counsel argued in summation that Scales must have been aware of Raymond Santiago's arrest in late 2018, the Government was entitled to argue the counter-inference: that Scales did not know of Santiago's arrest and therefore sought to have him murdered. See, e.g., United States v. Edwards, 342 F.3d 168, 181 (2d Cir. 2003) (finding that the government "has broad latitude in the inferences it may reasonably suggest to the jury during summation" (internal quotation marks omitted)); United States v. Marrale, 695 F.2d 658, 667 (2d Cir. 1982) (finding that a prosecutor is "entitled to respond to the evidence, issues, and hypotheses propounded by the defense"). Furthermore, greater leeway is appropriate here with regard to a rebuttal summation. United States v. Farhane, 634 F.3d 127, 167

(2d Cir. 2011) (noting that because rebuttal summations "frequently require improvisation," a court "will not lightly infer that every remark is intended to carry its most dangerous meaning" (internal quotation marks omitted)).

The Court finds that the Government was entitled to respond to defense counsel's argument by asking the jury to draw the opposite inference regarding whether or not Scales was aware of Santiago's arrest. A jury could reasonably draw such an inference from the facts in the record, and the Government's statement did not improperly shift the burden to the defendant.

Based on the foregoing, Scales's motion under Rule 33 for a new trial must be denied in full. The firearms evidence discussed above was properly admitted and a jury was entitled to consider all of the evidence at trial, from which the jury could reasonably infer Scales possessed all the guns in furtherance of the charged conspiracy. Scales is thus not entitled to a new trial on the murder-for-hire conspiracy count (Count Two) and firearms count (Count Five). Declining to give a multiple conspiracies charge was not error, and even if it were warranted, Scales did not suffer any prejudice. Nor do statements made in the Government's rebuttal summation warrant a new trial; the Government was entitled to respond to defense counsel's argument by asking the jury to draw the opposite evidentiary inference regarding whether or not Scales

was aware of Santiago's arrest. A jury could reasonably draw such an inference from the facts in the record, and the Government's statement did not improperly shift the burden to the defendant.

In sum, not only is there no basis to conclude that letting the guilty verdict stand would be a "manifest injustice," Ferguson, 246 F.3d at 134 (internal citation omitted), but, to the contrary, the overwhelming proof of Scales's guilty was uninfected by any error.

## CONCLUSION

For the foregoing reasons, the Court hereby denies Scales's motions under Federal Rules of Criminal Procedure 29 and 33 for judgment of acquittal or, in the alternative, for a new trial. The Clerk is directed to close the entry at docket number 249.

SO ORDERED.

Dated:    New York, NY

March 7, 2022                    JED S. RAKOFF, U.S.D.J.